**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF LOUISIANA**

**LAFAYETTE-OPELOUSAS DIVISION**

**ROBERT L. LAFOUNTAIN**                    **CIVIL ACTION NO. 06-1432**

**VS.**                                      **JUDGE MELANÇON**

**COMMISSIONER SOCIAL SECURITY**            **MAGISTRATE JUDGE METHVIN**
 **ADMINISTRATION**

**REPORT AND RECOMMENDATION**

Before the court is an appeal of the Commissioner's finding of non-disability.

Considering the administrative record, the briefs of the parties, and the applicable law, it is

recommended that the Commissioner's decision be **REVERSED**.

*Background*

Born on June 5, 1959, Robert L. LaFountain ("LaFountain") is currently 48 years old.

LaFountain attended special education classes until he was 21 years old and in the tenth grade.

LaFountain worked in the past as a construction laborer and potato packer.[1]

On November 13, 1997, LaFountain was found to be disabled and entitled to benefits due

to statutory blindness and diabetes mellitus with an onset date of June 30, 1997.[2]  Subsequently,

LaFountain's case was reviewed for the purpose of determining whether his disability continued,

and on November 19, 2001, a Notice of Disability Cessation letter was sent advising that

LaFountain's benefits would be terminated as of January, 2002 due to medical improvement of

his impairments.[3]  LaFountain requested a hearing and on June 26, 2003, a hearing was held

---

[1] Tr. 68 and 366.  The ALJ noted that LaFountain had "no vocationally relevant past work experience."  Tr. 18.

[2] Tr. 30.

[3] Tr. 32-34.

2

before an Administrative Law Judge, with LaFountain being unrepresented.[4]  On

August 26, 2003, the ALJ issued a decision finding that as of November 1, 2001, LaFountain was

no longer disabled because his condition had medically improved to the extent that he no longer

had severe impairments.[5]  LaFountain did not file a request for review with the Appeals Council.

On October 9, 2003, LaFountain filed a second application for benefits, alleging disability

since June 30, 1997 due to vision problems and diabetes.[6]  LaFountain's application was denied

on initial review, and an administrative hearing was held on July 17, 2005, during which

LaFountain added that he could not work due to depression.  In an opinion dated September 7,

2005, the ALJ denied benefits on grounds that LaFountain could perform work at all exertional

levels and was therefore not disabled.[7]   The Appeals Council denied review and LaFountain

timely filed this appeal.

### *Assignment of Errors*

LaFountain alleges the following errors: 1) the Appeals Council erred in failing to find

LaFountain disabled pursuant to Appendix 1 listing for adults, 20 C.F.R., Part 404, § 12.05;

2) the ALJ and Appeals Council erred in failing to consider LaFountain's 2003 application as an

appeal of the August 26, 2003 unfavorable decision terminating his disability benefits.

---

[4] Tr. 168.

[5] Tr. 168-172.

[6] Tr. 203-205.

[7] Tr. 17-23.

3

### *Standard of Review and the Commissioner's Findings*

The court's review is restricted under 42 U.S.C. §405(g) to two inquiries: (1) whether the

Commissioner's decision is supported by substantial evidence in the record; and (2) whether the

decision comports with relevant legal standards.  Carey v. Apfel, 230 F.3d 131, 136 (5th Cir.

2000); Anthony v. Sullivan, 954 F.2d 289, 292 (5th Cir.1992); Greenspan v. Shalala, 38 F.3d 232,

236 (5th Cir. 1994).  Substantial evidence is such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion.  Carey, 230 F.3d at 136; Anthony, 954 F.2d at 292;

Carrier v. Sullivan, 944 F.2d 243, 245 (5th Cir. 1991).  The court may not reweigh the evidence in

the record, nor substitute its judgment for that of the Commissioner, even if the preponderance of

the evidence does not support the Commissioner's conclusion.  Carey, 230 F.3d at 136; Johnson

v. Bowen , 864 F.2d 340, 343 (5th Cir.1988).  A finding of no substantial evidence is appropriate

only if no credible evidentiary choices or medical findings exist to support the decision.

Johnson, 864 F.2d at 343.

In determining whether a claimant is capable of performing substantial gainful activity,

the Secretary uses a five-step sequential procedure set forth in 20 C.F.R. §404.1520(b)-(f)

(1992):

> 1.   If a person is engaged in substantial gainful activity, he will not be
>      found disabled regardless of the medical findings.
>
> 2.   A person who does not have a "severe impairment" will not be
>      found to be disabled.
>
> 3.   A person who meets the criteria in the list of impairments in
>      Appendix 1 of the regulations will be considered disabled without
>      consideration of vocational factors.
>
> 4.   If a person can still perform his past work, he is not disabled.

4

5.      If a person's impairment prevents him from performing his past
        work, other factors including age, education, past work experience,
        and residual functional capacity must be considered to determine if
        other work can be performed.

When a mental disability claim is made, such as depression and mental retardation here,

the Commissioner utilizes a corollary sequential procedure for determining the merits of the

claim. Essentially, this procedure substitutes specialized rules at Step 2 for determining whether a

mental impairment is severe, and also provides detailed guidelines for making the Step 3

determination as to whether the mental impairment meets or exceeds the Listings.  The

Regulations require:

> [T]he ALJ to identify specifically the claimant's mental impairments, rate the
> degree of functional limitation resulting from each in four broad functional areas,
> and determine the severity of each impairment.  Furthermore, § 404.1520a(e)
> provides that the ALJ must document his application of this technique to the
> claimant's mental impairments.

Satterwhite v. Barnhart, 44 Fed.Appx. 652 (5th Cir. 2002) (unpublished).[8]

---

[8] For a succinct summary of the current law, see Serrano-Diaz v. Barnhart, 2004 WL 2431693, *6 (E.D.Pa. 2004):

1.      The ALJ must first evaluate the claimant's pertinent symptoms, signs, and laboratory findings to
        determine whether he or she has a medically determinable mental impairment.

2.      If a medically determinable mental impairment is found, the ALJ must then rate the degree of
        functional limitation resulting from the impairment in four areas: (1) activities of daily living; (2)
        social functioning; (3) persistence or pace of concentration; and (4) episodes of decompensation.
        See C.F.R. §404.1520a(c)(3).

3.      When a severe mental impairment is found, the Commissioner determines whether the impairment
        meets or exceeds the requirements of the Listings.

4.      When the severe mental impairment does not meet Listing requirements, the Commissioner then
        assesses the claimant's residual functional capacity.

The procedure states that if the degree of limitation in the first three functional areas is "none" or "mild,"
and "none" in the fourth area, the ALJ will generally conclude that the impairment is not severe, *unless the evidence
otherwise indicates that there is more than a minimal limitation in the claimant's ability to do basic work activities.*
Serrano-Diaz v. Barnhart, 2004 WL 2431693, *6 (E.D.Pa. 2004), citing 20 C.F.R. §404.1520a(d)(1).

5

After the ALJ issues a decision, the claimant may offer new evidence to the Appeals Council for consideration.  When the Appeals Council accepts and considers the evidence, the evidence becomes part of the administrative record that must be reviewed by the court. Higginbotham v. Barnhart, 405 F.3d 332, 337 (5th Cir. 2005).

In the instant case, the ALJ determined that LaFountain suffered from the following severe impairments: diabetes mellitus and hypertension - stable.  At Step 5, the ALJ found that LaFountain could perform work at all exertional levels, however he was limited by his limited education.  Relying on the testimony of a vocational expert, the ALJ found that there were jobs existing in significant numbers which LaFountain could perform, and therefore he was not disabled.  LaFountain submitted new evidence  - a report from his psychologist - to the Appeals Council.  The Appeals Council considered the report but denied the request for review.

### *Administrative Record*

*Diabetes Mellitus:* LaFountain was examined by Derek Metoyer, a general practitioner, on June 6, 2000, who noted that LaFountain's diabetes mellitus was treated with Glucophage, Amaryl, Humulin (insulin).[9]  On July 10, 2001, Dr. Metoyer noted that LaFountain's diabetes was stable.[10]

On September 20, 2001, LaFountain was examined at Opelousas General Hospital complaining of confusion and lethargy.[11]  LaFountain was diagnosed with symptomatic hypoglycemic episode and given intravenous medication and discharged to home.   On

---

[9] Tr. 132.

[10] Tr. 123.

[11] Tr. 109-111.

6

December 18, 2003, the SSA noted that because of the hypoglcemic episode, LaFountain should

not work in hazardous conditions, such as work involving heights, machinery, and climbing.[12]

On November 27, 2001, LaFountain was examined by Dr. Metoyer complaining of

numbness in his feet.[13]  Dr. Metoyer diagnosed peripheral neuropathy.  LaFountain continued

treatment with Dr. Metoyer, who monitored his diabetes.  On October 20, 2003, LaFountain

reported that he continued to be compliant with his medication, but not his diet.[14]

On February 1, 2005, LaFountain was examined at University Medical Center ("UMC"),

complaining of weekly stomach aches, nausea, one episode of bloody stool, and an unexplained

12-pound weight loss.[15]   On April 20, 2005, LaFountain was again examined at UMC.[16]

LaFountain complained of daily headaches lasting 3-4 hours long.  It was noted that

LaFountain's diabetes was uncontrolled.

*Hypertension:* On May 9, 2000, Dr. Metoyer noted that LaFountain's hypertension was

stable.[17]  LaFountain's hypertension remained stable throughout his treatment with Dr. Metoyer.[18]

---

[12] Tr. 311.

[13] Tr. 118.

[14] Tr. 289.

[15] Tr. 328.

[16] Tr. 321.

[17] Tr. 134.

[18] Tr. 122.

7

*Vision:*  In 1997, LaFountain had sub-capsular cataracts and corrected visual acuity of 20/200.[19]  LaFountain was diagnosed with pseudophakia.[20]  In 1998, LaFountain underwent bilateral cataract surgery with intraocular lens implants.[21]  LaFountain's corrected vision is 20/20 bilaterally.[22]

*Hearing:* On May 9, 2001, LaFountain was examined by Dr. Richard Bidstrup, an ear, nose, and throat physician, who diagnosed LaFountain with non-syndromic hearing loss (NSHL) at high frequencies.[23]  During an examination conducted at the request of Disability Determination Services ("DDS"), Dr. W. J. Briley, and internist, noted that LaFountain hears conversational voices without problem.[24]

*Mental Impairments:* On November 27, 2001, LaFountain was examined by Dr. Metoyer.[25]  LaFountain complained of feeling depressed and not being able to sleep well.  Dr. Metoyer diagnosed LaFountain with depression and prescribed Zoloft.  On December 27, 2001, LaFountain was examined by Dr. Metoyer complaining of feeling anxious most of the time.[26]  Dr. Metoyer prescribed the anti-anxiety medication Xanax.

---

[19] Tr. 169.

[20] Pseudophakic pertains to an eye that has an intraocular lens implant. http://eyemdlink.com/terminology/pseudophakic.htm

[21]  Tr. 285.

[22] Tr. 262.

[23] Tr. 141.

[24] Tr. 143.

[25] Tr. 118.

[26] Tr. 117.

8

On February 5, 2002, at the request of DDS, LaFountain was evaluated by Sandra B. Durdin, Ph.D., a clinical psychologist.[27] LaFountain reported that he felt depressed and anxious and that he sometimes heard voices. LaFountain also indicated that being around people makes him irritated and aggravated. Dr. Durdin found that LaFountain "is apparently anxious and edgy quite easily, but not psychotic or severely depressed."[28] Dr. Durdin noted that his "language development is simple."[29] Dr. Durdin did not perform intelligence testing, however, she estimated that LaFountain had borderline intelligence and commensurate adaptive skills at a minimum. She concluded that he was competent to manage his own affairs. Dr. Durdin diagnosed LaFountain with adjustment disorder with mixed emotional features.

On March 12, 2003, the Social Security Administration ("SSA") had a non-examining medical consultant, conduct a Psychiatric Review Technique ("PRT").[30] The consultant concluded that LaFountain's adjustment disorder only mildly affected his functional abilities.

LaFountain testified at the administrative hearing held on July 19, 2005, that he cannot read and that he was socially promoted in school.[31] LaFountain does not have a driver's license. His sister drives him, reads things for him, and helps take care of his affairs.

On October 31, 2005, at the request of his attorney, LaFountain was evaluated by Naomi Friedberg, Ph.D., a clinical psychologist.[32] Dr. Friedberg noted that LaFountain put forth a good

---

[27] Tr. 135-136.

[28] Tr. 136.

[29] Tr. 135.

[30] Tr. 147-160.

[31] Tr. 365, 372-373.

[32] Tr. 357-360.

9

effort, however, "his mood and affect were significantly depressed."[33]  LaFountain became

frustrated with test tasks.  Dr. Friedberg administered the WAIS-III, which showed that

LaFountain had a verbal IQ of 68, performance IQ of 60 and full scale IQ of 62.  Dr. Friedberg

diagnosed LaFountain with major depressive disorder, recurrent, and "mild mentally disabled."[34]

### *Findings and Conclusions*

**I.      Appendix 1 Listing**

LaFountain alleges that the Appeals Council erred in not finding that he meets the

requirements for an Appendix 1 listing for adults, 20 C.F.R., Part 404, § 12.05.  The

requirements for mental retardation under §12.05 are as follows:

> *Mental retardation:* Mental retardation refers to significantly subaverage general
> intellectual functioning with deficits in adaptive functioning initially manifested
> during the developmental period; i.e., the evidence demonstrates or supports onset
> of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A,
> B, C, or defendant are satisfied.
>
> ***
>
> (C) A valid verbal, performance, or full scale IQ of 60 through 70 and a physical
> or other mental impairment imposing an additional and significant work-related
> limitation of function.

In order to meet the listing, the impairment must satisfy the "diagnostic description in the

introductory paragraph and any one of the four sets of criteria [paragraphs A, B, C, D]."

20 C.F.R., Part 404, § 12.00A.   The Regulations state that "[t]he results of standardized

intelligence tests may provide data that help verify the presence of mental retardation or organic

---

[33] Tr. 357.

[34] Tr. 360.

10

mental disorder, as well as the extent of any compromise in cognitive functioning." 20 C.F.R. Pt.

404, Subpt. P, App. 1, Section 12.00(C)(6)(a).  Nevertheless, because "the results of intelligence

tests are only part of the overall assessment, the narrative report that accompanies the test results

should comment on whether the IQ scores are considered valid and consistent with the

developmental history and the degree of functional limitation."  Id.

In the instant case, LaFountain's WAIS-III scores yielded a verbal IQ of 68, performance

IQ of 60 and full scale IQ of 62.  Thus, his raw scores meet the first prong of § 12.05(C).

Dr. Friedberg concluded:

> Mr. LaFountain's ability to understand, remember, and carry out simple,
> moderate, and detailed instruction all appear to be negatively impacted not only by
> low intellectual functioning, but long term moderately severe depression.  His
> ability to maintain attention to perform simple repetitive tasks, over a two hour
> block of time, and certainly his ability to persist at a normal pace over a forty hour
> work week, would be negatively impacted by both his low intellectual functioning
> and mood disorder.  His ability to relate to others appeared to be generally
> adequate, although he claims to isolate himself and has difficulties being around
> others.  Mr. LaFountain indicated that he gets frustrated with other people easily
> and has a short temper, and believed that he would have difficulty holding down a
> job.  Given Mr. LaFountain's presentation today, it is likely that he would have
> difficulty handling the stress and pressure associated with work activity.  He
> would need help in managing his financial affairs.[35]

Dr. Friedberg's standardized testing results are the only IQ tests in the record.

Dr. Durdin, who evaluated LaFountain at the request of DDS, did not perform any standardized

intelligence testing, but she did note that he had borderline intellectual functioning.[36]

LaFountain maintains that since he has a full scale IQ of 62 and moderately severe

depression, diabetes mellitus, and hypertension, he meets the requirements of § 12.05(C).  The

Commissioner contends that LaFountain has not established that he was mentally retarded prior

---

[35] Tr. 360.

[36] Tr. 135-136.

11

to age 22 and that he does not have a "physical or other mental impairment imposing an

additional and significant work-related limitation of function."

It is clear that an IQ of 62 reflects subaverage intelligence.  Moreover, LaFountain was in

special education classes while in school and he was only in the 10th grade when he quit school at

the age of 21.  Thus, prior to the age of 22, LaFountain was not functioning in normal classes.

This supports a finding that he had deficits in adaptive functioning prior to 22 years of age.

With regard to the requirement that an additional physical or mental impairment be

present in order to meet the Listing, the additional impairments do not have to be disabling in and

of themselves.[37]  Instead, the issue is whether the impairment is only a slight abnormality which

has such minimal effects on LaFountain that it would not be expected to interfere with her ability

to work.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 §12.00(A); Stone v. Heckler, 752 F.2d 1099 (5th

Cir.1985).   The ALJ found that LaFountain's diabetes mellitus and hypertension - stable

constitute severe impairments.   Additionally, it is clear from Dr. Friedberg's report that

LaFountain's depression affects his ability to concentrate, maintain pace, and otherwise handle

the stress of work activities.  Thus, LaFountain has both additional physical and mental

impairments in addition to the requisite IQ score.

Accordingly, the undersigned concludes that LaFountain meets the requirements of

§ 12.05(C).  This is not contradicted by the fact that prior to 1997, LaFountain was capable of

---

[37] Section 12.00(A) defines "significant work-related limitation of function" as a "severe impairment:"
    For paragraph C, we will assess the degree of functional limitation the additional impairment(s)
    imposes to determine if it significantly limits your physical or mental ability to do work activities,
    i.e., is a 'severe' impairment(s), as defined in §§ 404.1520(c) and 416.920(c).  If the additional
    impairment(s) does not cause limitations that are 'severe' as defined by § 404.1520(c) and
    416.920(c), we will not find that the additional impairment(s) imposes 'an additional and
    significant work-related limitation of function' even if you are unable to do your past work because
    of the unique features of that work. . .

20 C.F.R. Pt. 404, Subpt. P, App. 1 §12.00(A).

12

working as a laborer and potato packer even though he had an IQ of 62.  LaFountain did not stop

working due solely to his intellect, but rather due to the onset of diabetes, hypertension, and

depression.  The combination of these impairments meets the requirements of the Listing and

prevents LaFountain from working.

Considering the IQ scores in the record, combined with the information regarding

LaFountain's deficits in adaptive functioning prior to age 22, and his impairments which impose

additional and significant work-related limitations, the undersigned finds that substantial

evidence does not support the Commissioner's finding that LaFountain does not meet or equal a

listing impairment.  It is therefore recommended that LaFountain be awarded benefits consistent

with an onset date of June 30, 1997.[38]

## II.    October, 2003 Application as an Appeal

LaFountain argues that the ALJ and Appeals Council erred in failing to consider

LaFountain's October 9, 2003 application as an appeal of the unfavorable decision ceasing his

benefits issued August 26, 2003.  LaFountain argues that at the time of the October 9, 2003

filing, he was unrepresented and the new application should have been considered an appeal of

the unfavorable decision.  LaFountain argues that because subsequent psychological evaluation

showed that he has mental retardation, the August, 2003 unfavorable decision was erroneous.

The undersigned notes that although LaFountain was unrepresented at the time, he had

previously, with the help of his sister, navigated the SSA filing system and completed the

necessary forms at each stage.  LaFountain, without the assistance of counsel, filed for benefits,

was awarded benefits, and requested a hearing when he was initially notified that his benefits

---

[38] The undersigned is cognizant of the fact that since LaFountain failed to appeal the Commissioner's finding that his disability ceased as of November 1, 2001, his eligibility for actual benefits may be impacted by that fact, as well as the fact that he previously received benefits during the time period in question.

13

would cease.  Moreover, the Notice of Decision - Unfavorable issued August 26, 2003 clearly

explained how to file an appeal with the Appeals Council:

> How To File An Appeal
>
> To file an appeal you or your representative must request that the Appeals Council review the decision.  You must make the request in writing.  You may use our Request for Review form, HA-520, or write a letter.
>
> You may file your request at any local Social Security office or a hearing office.  You may also mail your request right to the Appeals Council, Office of Hearing and Appeals, 5107 Leesburg Pike, Falls Church, VA 22041-3255.[39]

The Notice also explained that filing a new application does not constitute an appeal:

> You have the right to file a new application at any time, but filing a new application is not the same as appealing this decision.  If you disagree with my decision and you file a new application instead of appealing, you might lose some benefits, or not qualify for any benefits.  My decision could also be used to deny any new application for insurance benefits if the facts and issues are the same.  So if you disagree with this decision, you should file an appeal within 60 days.***[40]

Additionally, at some point prior to the July 19, 2005 administrative hearing, LaFountain

retained counsel.  Counsel did not attempt to convert the October, 2003 application into an

appeal.  Counsel failed did not address this issue at the administrative hearing, but instead

counsel went forward with the hearing and allowed the ALJ to consider the application as a new

one.

Considering the foregoing, the undersigned concludes that the ALJ and Appeals Council

did not err in considering the October, 2003 application as  a new application.

---

[39] Tr. 165.

[40] Tr. 166.

14

*Conclusion*

The undersigned finds that substantial evidence of record supports the ALJ's decision. Accordingly, it is **RECOMMENDED** that the Commissioner's decision be **REVERSED** and that LaFountain be awarded benefits consistent with an onset date of June 30, 1997.[41]

Any judgment entered herewith will be a "final judgment" for purposes of the Equal Access to Justice Act (EAJA).  See, <u>Richard v. Sullivan</u>, 955 F.2d 354 (5th Cir. 1992) and <u>Shalala v. Schaefer</u>, 509 U.S. 292 (1993).

Under the provisions of 28 U.S.C. Section 636(b)(1)(C) and Rule 72(b), parties aggrieved by this recommendation have ten (10) business days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within ten (10) days after receipt of a copy of any objections or responses to the district judge at the time of filing.

**Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within ten (10) days following the date of receipt, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error.  See**

---

[41] See fn. 38, *supra.*

15

**Douglass v. United Services Automobile Association, 79 F.3d 1415 (5th Cir.  1996).**

Signed at Lafayette, Louisiana, on October 11, 2007.

Mildred E. Methvin
United States Magistrate Judge
800 Lafayette St., Suite 3500
Lafayette, Louisiana 70501
(337) 593-5140 (phone) 593-5155 (fax)